S. P. HAWVER *et al., vs.* A. SELDENRIDGE *et al.*

July Term, 1867.

1. A *de facto* office cannot exist under a constitutional government; but the acts of a *de facto* officer when a government is wholly revolutionized, are, *ex necessitate*, valid.

2. In order to make valid the acts of a *de facto* officer, he must be exercising the functions of a *de jure* or *de facto* office.

3. When a State government is in insurrection or rebellion, and committing acts of hostility against the government of the United States, and the same is so declared by the political department of the United States government, the acts of all officers claiming allegiance to and adhering to the State government that is so committing acts of hostility, are null and void.

4. A writ was issued out of what was claimed to be the clerk's office of the circuit court of G. county on the 18th day of May, 1863, signed by C. A. S. as clerk. A bill, answers and some depositions were filed shortly afterwards in the cause. On the 12th day of April, 1866, the following order was entered: "This cause having originated and being proceeded in before the late so-called circuit court of the county of *Greenbrier*, a court in rebellion against the government of the United States, having no legal or political status or existence, and whose judicial acts and privileges (as well as officers) whether civil or criminal, cannot be recognized as valid by this court: It is therefore adjudged, ordered and decreed by this court that the institution of the said suit and all the acts and proceedings had therein before the late so-called circuit court of the county of G. are null and void. And on motion of the defendants by their counsel it is ordered that this cause be dismissed from the docket of this court. But without prejudice," &c. HELD:

   1. C. A. S., the clerk, was by the proclamation of the executive department of the government of the United States, declared to be "in insurrection and rebellion" against its authority, on the 1st day of July, 1862, and under the ordinances of the convention that reor-

*See page 187.

ganized and restored the government of Virginia, at Wheeling, the offices of all who attempted to exercise the functions thereof in the interest of the insurgent government were declared to be vacant; therefore, he was not exercising the functions of an office *de jure*, and his acts were null and void.

2. The clerk who issued the writ was not acting in subordination to the authority of the United States, but was acting in subordination to the authority of the insurrectionary government of the State of Virginia, then in "insurrection and rebellion" and committing acts of hostility, against the government of the United States; and having been by the latter declared to be in "insurrection and rebellion," the acts of the clerk were not the acts of a *de facto* officer exercising the functions of a *de facto* office, as the insurrectionary government was never acknowledged by the political department of the United States government to be a *de facto* government.

The material facts presented in the record of this cause, are stated in the opinion of Judge Maxwell.

*Lamb & Paull* for the appellants.

*B. H. Smith* for the appellees.

MAXWELL, J.  It appears from the record in this cause that Samuel P. Hawver and others on the 18th day of May, 1863, sued out of what was claimed to be the clerk's office of the circuit court of Greenbrier county, a subpœna in chancery against Archibald Seldenridge and others.  This process was signed by Charles A. Stuart, as clerk, and was made returnable at rules on the first Monday in June next thereafter.  On the said first Monday in June the said Hawver and others appeared at rules and filed their bill against the said Seldenridge and others, who appeared at rules in September following, and filed their separate answers to the said bill.  No further proceedings seem to have been taken in the said cause, except that some depositions were taken, until on the 12th day of April, 1866, when the following order was made in the case:  " This cause having originated and being wholly proceeded in before the late so-called circuit court of the county of Greenbrier, a court in rebellion against the government of the United States, having no

legal or political status or existence, and whose judicial acts and privileges, (as well as officers) whether civil or criminal, cannot be recognized as valid by this court: It is therefore adjudged, ordered and decreed by this court that the institution of the said suit and all the acts and proceedings had therein before the late so-called circuit court of the county of Greenbrier, are null and void. And on motion of the defendants by their counsel Alexander Walker, it is ordered that this cause be dismissed and stricken from the docket of this court. But this is without prejudice to any suit which may hereafter be brought by either party in a proper court; and leave is given to the parties to withdraw any bond or other original paper filed by them in this cause, upon leaving a copy thereof properly certified by the clerk of this court."

The cause came on at the last term of the court to be heard, and was then argued very briefly on behalf of the appellants, but was not argued on behalf of the appellees. The questions presented in the record are not only novel, but of great importance in their bearings; and it was therefore thought best not then to decide the case, as it was understood that the same questions would be argued fully at this term, in other cases pending here. The points arising in the case have at this term been argued in two or three other causes, but in such a manner as to assist us but little in the proper investigation of them. We do not think it proper that we should any longer delay the decision of the case for further argument.

The order dismissing the case is based upon the ground that "the cause originated and was wholly proceeded in before the late so-called circuit court of the county of Greenbrier, a court in rebellion against the government of the United States." It does not appear that any order was at any time made in the cause by any judge of the court before the order was made dismissing it. The question, therefore, arising upon the record is, was Charles A. Stewart, on the 18th day of May, 1863, the day on which the process was issued by him, either *de jure* or *de facto* clerk of the cir-

cuit court of Greenbrier county? If he were either a *de jure* or a *de facto* clerk, the proceedings in the cause were regular, the case properly on the docket, and should not have been dismissed as it was, for it is an established principle of the common law, well settled by a long and consistent series of decisions that the acts of an officer *de facto*, though he may be ineligible, or his title bad, are valid as far as they concern the public, or the rights of third persons, who have an interest in the things done.    Jenkins' Rep., 131; 1 Denio, 579; 16 Peters, 71; 5 Hill, 616; 9 Johns., 549; 5 Wend., 231; 4 T. R., 366; 17 Vin. Abr., 114; *Harbaugh* vs. *Wisner*, 38 Missouri R., 327.

Was Stuart exercising the functions of an office either *de jure* or an office *de facto* at the time the process was issued by him?

We must bear in mind that "the constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding;" and that at the time when and before the process issued an insurrection existed in certain States of the Union, for the purpose of throwing off all allegiance to the constitution and laws of the United States.

The insurrectionists had organized and were attempting to set up a government in hostility to the constitution and laws of the United States, with legislative, executive and judicial departments, and with officers repudiating allegiance to the United States and claiming to owe allegiance only to the government which they were attempting to set up.    Every officer who refused to discharge the functions of his office in subordination to the constitution and laws of the United States, and attempted to exercise them in subordination to the pretended government attempted to be set up, necessarily forfeited and vacated his office.

The Richmond convention by ordinance of April 17th, 1861, and other ordinances, attempted to throw off the allegiance of the people of Virginia to the government of the United States, and to transfer it to the pretended government which was then attempted to be set up. These acts were without authority of law and were null and void. But numerous officers throughout the State, perhaps a very large majority of them, including the governor, claiming to adhere to the convention, did in fact by their own acts repudiate the constitution and laws of the United States and refused to discharge the functions of their respective offices in subordination thereto, and attempted to exercise them in subordination to, and in the interest of the government attempted to be set up, whereby their offices were forfeited. The people of Virginia being thus left without officers, especially without a governor, in subordination to the constitution and laws of the United States, met at Wheeling in large numbers, in person and by representatives, and reorganized and restored the government of the State, which restored government was recognized by all the political departments of the government of the United States as the legal government of Virginia. The declaration made by the convention at Wheeling on the 13th of June, 1861, before the ordinance was passed that re-organized and restored the government of Virginia, declared that the offices of all who adhered to the convention at Richmond " whether legislative, executive or judicial, are vacated." This declaration did not operate to vacate the offices of those who adhered to the Richmond convention, but it simply declared a fact that already existed; that is, that such persons by repudiating the constitution and laws of the United States and claiming to exercise the functions of their offices in the interest of the pretended new government, had by such acts already vacated their offices, but was an authoritative declaration that such offices were vacant. Whether or not any particular office was vacant, depended upon whether or not the officer attempted to exercise the functions of his office in hostility to the government of the United States

and in the interest of the pretended new government. It
would have been within the power of the Wheeling conven-
tion to have declared that every office in the State was va-
cant whether the incumbent adhered to the Richmond con-
vention or not, but it did not do so.

On the 19th day of June, 1861, the convention passed the
" ordinance for re-organizing the State government." This
ordinance provided for the appointment by the convention
of a governor and some other officers, and provided that
the " governor, lieutenant-governor, attorney-general, mem-
bers of the legislature and all officers now in the service of
the State, or of any county, city or town thereof, or hereaf-
ter to be elected or appointed for such service," &c., should
each take what is known as the oath to support the restored
government, before proceeding in the discharge of their
several duties. And further provided that " if any elective
officer who is required by the preceding section to take such
oath or affirmation, fail or refuse so to do, it shall be the
duty of the governor upon satisfactory evidence of the fact
to issue his writ declaring the office to be vacant, and pro-
viding for a special election to fill such vacancy at some con-
venient and early day to be designated in said writ : of which
due publication shall be made for the information of the
persons entitled to vote at such election," &c. The effect of
this ordinance was to go one step further, in one particular,
than had been done before, and declare the offices to be va-
cated of all who failed or refused to take the oath prescrib-
ed. An officer may not have vacated his office by claiming
to adhere to the Richmond convention ; yet this ordinance
declared it to be vacant if he failed to take the oath pre-
scribed. On the other hand an officer who had vacated his
office for disloyal acts was in effect restored to his office if
he should in fact take the oath prescribed in the ordinance,
but not without doing so. On the 20th day of August fol-
lowing, the convention passed another ordinance on the sub-
ject of offices, the effect of which was nothing further than
to take away from them who had forfeited and vacated their
offices for disloyal acts and had not been restored before

that time by taking the oath under the last named ordinance, the privilege of being restored by taking the oath after that time.

On the 26th day of July, 1861, the General Assembly, organized under the restored government, passed an act entitled, "An act to provide for declaring certain offices vacant." This was an act making it the duty of the governor to enforce the ordinance restoring the government, so that all officers should take the oaths therein prescribed. The act authorizes the governor to issue his proclamation, requiring all officers in any county or judicial district to take the oath specified in the ordinance aforesaid, and file the proper evidence of their having taken the same in the office of the secretary of the commonwealth, within the time named in the proclamation. If any officer failed to take the required oath and file the evidence thereof in the time required, the governor was authorized to declare the office vacant and cause the vacancy to be filled. This act did not vacate any office in the State, nor did it restore to office any one who had forfeited and vacated his office. It simply provided the mode in which the governor should ascertain and declare what offices were vacant. If the governor under this act declared any particular office to be vacant, his declaration was conclusive of the fact. And though the governor did not ascertain and declare any particular office to be vacant, the fact that it was vacant may be ascertained in any other competent way. From the foregoing brief review of the declaration and ordinances of the convention which restored the government of the commonwealth of Virginia, it is plain the principle is fully recognized that all persons holding office, who repudiated the constitution and laws of the United States and attempted to exercise the functions of their offices in the interest of the insurgent government, thereby vacated them.

This court must take notice judicially of all the political acts of the governor, and it does not appear that the governor had, up to the time the process issued in this cause, declared the office of the clerk of the circuit court of Green-

brier to be vacant. Can this court ascertain the fact of vacancy in any other way? The most convenient and appropriate mode of ascertaining the fact would perhaps have been upon an issue of fact in the court below; but that has not been done. As I have before stated, an insurrection existed, formidable in character, in certain parts of the United States against its constitution and laws, for the purpose of setting up a new and other government in the room and independent of the government of the United States; which new and pretended government attempted to be set up, consisted of legislative, executive and judicial departments corresponding to the various departments of the regular government. The insurrection had become so formidable that the laws of the United States could not be executed in the insurrectionary district by the ordinary course of judicial proceedings, and the military power of the general government was being used to suppress it, and a civil war was, in fact, existing. The President of the United States by a proclamation issued by him on the 1st day of July, 1862, in conformity to an act of Congress passed on the 7th day of June, 1862, declared, "that the States of South Carolina, Florida, Georgia, Alabama, Louisiana, Texas, Mississippi, Arkansas, Tennessee, North Carolina, and the State of Virginia except the following counties: Hancock, Brooke, Ohio, Marshall, Wetzel, Marion, Monongalia, Preston, Taylor, Pleasants, Tyler, Ritchie, Doddridge, Harrison, Wood, Jackson, Wirt, Roane, Calhoun, Gilmer, Barbour, Tucker, Lewis, Braxton, Upshur, Randolph, Mason, Putnam, Kanawha, Clay, Nicholas, Cabell, Wayne, Boone, Logan, Wyoming, Webster, Fayette and Raleigh, are now in insurrection and rebellion, and by reason thereof the civil authority of the United States is obstructed," &c. The county of Greenbrier is not included in the excepted counties, and as it was at that time one of the counties of Virginia, was declared to be in "insurrection and rebellion." The language of this proclamation is peculiar. It declares that the *States* are in insurrection and rebellion. It is difficult to tell the precise scope and effect of this language, as a State is a corporate body politic, with

a constitution and laws, and with officers legislative, executive and judicial. But to give to the language used the most limited signification that it could have and the meaning manifestly intended, it would still have the effect to declare that the officers within the States named and not excepted were at that time in "insurrection and rebellion." Giving then to the language of the proclamation this construction, Stuart, the clerk of the circuit court of Greenbrier county was by it declared to be in "insurrection and rebellion," so that by the declaration and ordinance of the restored government, the office was declared to be vacant and Stuart was not exercising the functions of an office *de jure;* therefore his acts were null and void.

But it is claimed that inasmuch as the clerk did in fact issue the process in the cause, therefore he was a clerk *de facto* and his acts valid. I have shown that he was not acting in subordination to the United States government, but that he was acting in hostility thereto, and as an officer of the insurgent government, which was then being attempted to be established. What would be the effect if this court holds his acts valid? It would be to acknowledge the existence and validity of the insurgent government, so far as this court could do it, for this clerk was just as much a part of it as was any other officer in it. It would be to repudiate the result of the war as well as the purposes for which it was waged by the government of the United States, for, the purpose for which it was waged, was to suppress the insurrection and prevent the insurgent government from being established, and such was its result. The judicial department of the insurrection was just as vital a part of it as was the legislative or executive departments, or its military power, and its act cannot be any more valid or durable than the acts of the legislative or executive departments, or its military orders. But still, it is insisted that we must decide that he was an officer *de facto,* exercising the duties of a *de facto* office and his acts valid, or else array ourselves in opposition to the rulings of other courts on similar questions. There has not been a single case cited before this

court in the argument of this case, or in any other argued before us, in which any principle has been settled, which would require, or even justify this court in holding that he was an officer *de facto*, exercising the duties of a *de facto* office. No case has been cited nor have I been able to find one in which the acts of a *de facto* officer have been held valid unless it was where he was exercising the functions of either a *de jure* or *de facto* office. Most of the cases cited are where the offices were legal and constitutional, but where there was some irregularity in the eligibility, election or qualification of the officers. A *de facto* office cannot exist under a constitutional government, but when the government is entirely revolutionized, and all its departments usurped by force, then prudence recommends and necessity enforces obedience to the authority of those who may act as the public functionaries; and in such cases the acts of a *de facto* executive, a *de facto* judiciary and a *de facto* legislature must be recognized as valid. And such is the character of the cases referred to in Jenkins, 131, cited in argument. He was not exercising the duties of a *de facto* office unless the government of the United States was subverted and the insurgent government had become a *de facto* government. *Hildreth's heirs* vs. *McIntire's devisees*, 1 Marshall's Rep. 206. If it was a *de facto* government its offices were all *de facto* offices and its officers *de facto* officers. Whether or not the insurgent government ever became a *de facto* government this court cannot know judicially. That· is a fact which the political department of the government must determine, and its determination is conclusive of the question on all other departments, and of which they must take notice. *Prize cases* 2 Black: *Luther* vs. *Borden*, 7 Howard, 1; *Gilson* vs. *Hoyt*, 3 Wheat., 246: *United States* vs. *Palmer*, 3 Wheat., 610; *United States* vs. *Reynes*, 9 Howard, 127. The political departments of the government never acknowledged the insurgents as a government *de facto*, or in any sense a political power, but always held the contrary. Stuart, therefore, was not exercising the functions of even a *de facto* office, and his acts are void, even as to third parties.

It is claimed that under the constitution and laws of this State, officers elected or appointed and acting under the laws of Virginia within this State, are continued in office until their successors are elected and qualified.    The fair interpretation of these provisions is, that they apply only to persons in office under the restored government of Virginia, and who recognized its authority. .

The petition in this case asserts that this is a question of great magnitude to the community from which the case comes, and that if the order of the court is right it would make confusion confounded and harass the community excessively.    While this may be true, yet it is one of the many unhappy results growing out of the late unfortunate rebellion, and which this court has no power to relieve against.

I think the order complained of will have to be affirmed.

The President concurred.

DECREE AFFIRMED.